# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 15, 2010 Session

# IN THE MATTER OF DAVID J. B. ET AL.[1]

### Appeal from the Juvenile Court for Dickson County
### No. 06-09-036-CC      A. Andrew Jackson, Judge

### No. M2010-00236-COA-R3-PT - Filed July 23, 2010

Mother appeals the termination of her parental rights to her two youngest children. The trial court found three grounds upon which to terminate Mother's parental rights: abandonment by failure to provide a suitable home, failure to remedy persistent conditions and mental incompetence; and the court found that termination was in the children's best interests. We affirm.

### Tenn. R. App. P.3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

James L. Baum, Burns, Tennessee, for the appellant, Patricia S.

Robert E. Cooper, Jr., Attorney General and Reporter, and Lindsey O. Appiah, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

The central figure in this tragic circumstance is Patricia S., a mother of seven children, who has a long history of mental health issues and marrying or cohabiting with physically abusive men, some of whom are convicted sex offenders.

Mother gave birth to her first child when she was fifteen; the father of her first child was seventeen years her senior and was physically abusive of Mother. The father of her third child was also abusive and used illegal drugs. Michael A., a husband with whom she has two

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

children, was twice convicted of sexual offenses. The two children at issue in this appeal, her sixth and seventh children, are David B. and Savannah S. The father of David was physically abusive of Mother, and the purported father of Savannah is a convicted sexual offender. At one time or another, each of these men resided with Mother and some of her minor children.

All seven of Mother's children are no longer in her custody. Her two oldest children were removed by child protective services of Nebraska in December 1994, and her third child was removed from her custody by child protective services of Iowa. Mother's parental rights to her three oldest children were terminated; the parental rights of the fathers of those children were also terminated. Mother's fourth and fifth children are presently in the custody of child protective services in the state of Washington; the petition to terminate the parental rights of Mother and the fathers of those children is pending.

David and Savannah have been in the custody of the Department of Children's Services of Tennessee since August 2, 2008. The parental rights of the men believed to be the fathers were terminated and the fathers did not appeal. Only Mother appeals.

Tennessee's Department of Children's Services ("DCS") initially became involved with Mother in July 2008 when Lydia Bennett, a DCS child protective services assessor, received a report that Mother's boyfriend may have physically abused one of the four children then residing with her in Tennessee. It was reported that one of the children had a visible mark on his back, allegedly caused by being hit with a belt buckle. As a result of the report and the ensuing inquiry by DCS, a noncustodial safety plan was implemented on July 11, 2008. The plan covered areas in which Ms. Bennett believed Mother needed assistance, including her mental health, one child's physical health, another child's speech, parenting classes, finding stable housing, and finding a job conducive to raising four children.

Two weeks later, during a routine visit on July 22, 2008, Ms. Bennett found bruising on one of the children; upon inquiry by Ms. Bennett, the child reported that Mother had hit him on the back with a shoe. Ms. Bennett discussed her findings with Mother, and reported that Mother may have physically abused the child.

Shortly thereafter, Mother took two of her children (her fourth and fifth) to Washington to live with their father, who had just been released from prison. While in Washington, Mother left David and Savannah in the care of an acquaintance in Tennessee. On August 2, 2008, three days after DCS learned that Mother had gone to Washington and placed two of her children in the custody of a convicted sexual offender, David and Savannah were placed in DCS custody. The juvenile court found the children were dependent and neglected. DCS notified child protective services in Washington that two of the children would be living in the state with their father, a convicted sex offender.

After the children were placed in DCS custody and the juvenile court adjudicated the children dependent and neglected, a new permanency plan was created on September 8, 2008 requiring Mother to: (1) attend visitations; (2) participate in a parenting assessment and follow all recommendations; (3) set up a home study after securing housing; (4) undergo a clinical interview and comply with all recommendations; and (5) undergo a drug and alcohol assessment and follow all recommendations.

Because Mother chose to remain in Washington indefinitely, it became necessary for Tennessee and Washington to coordinate the administration of services to assist Mother with the requirements of the permanency plans of both states to avoid redundancy of services. Following discussions between Lydia Bennett, the Tennessee DCS child protective services assessor, and Paige Cummings, the family services worker assigned to assist Mother in Washington, it was agreed that the state of Washington would provide the appropriate services to Mother, including parenting classes, a psychological assessment, and random drug screens, which was required by the court in Washington.

In October 2008, Mother decided that she wished to permanently reside in Washington. As a result, DCS completed an interstate compact with Washington pursuant to which Washington would provide the necessary services. Washington state agreed to obtain a home study and DCS agreed to pay for monthly plane tickets for Mother to travel to Tennessee, and to also pay for three psychological assessments, a drug and alcohol assessment, and a drug and alcohol counselor.

In November 2008, a family therapist performed a parenting assessment of Mother, during which, Mother stated that she had been diagnosed with bipolar disorder and schizophrenia, but that she had not taken any medication in ten years. The family therapist also conducted a drug and alcohol assessment, which, the therapist testified, indicated Mother had a possible alcohol addiction. Mother stated that she did not drink alcohol, and she felt that she was not in need of drug and alcohol treatment, despite the fact that one of her children was born with fetal alcohol syndrome.

DCS created a second Permanency Plan for Mother in January 2009. The stated goal was amended to include the possibility of adoption. The caseworker reviewed the Plan with Mother as well as the Criteria and Procedures for Termination of Parental Rights with Mother. Mother signed both the Plan and the Criteria.

In April 2009, Mother underwent a psychological evaluation in Washington. The evaluation was performed by psychologist Dr. Michael O'Leary. The evaluation tested cognitive factors such as intelligence, concentration, attention, and executive decision making functions, as well as personality and parenting issues. After the psychological

evaluation, Dr. O'Leary diagnosed Mother with Post Traumatic Stress Disorder, major depression, and other psychological disorders including mixed personality disorder with narcissistic, histrionic, and borderline features. Dr. O'Leary determined that Mother had problems with her executive decision making, "[which] has to do with learning from experience, being able to evaluate behavioral situations accurately, planning and understanding cause and effect relationships." Dr. O'Leary also determined that Mother's poor executive decision making "is related to perseveration, which is defined as bringing the same ineffective solutions to problems over and over without learning from experience."

Based on his findings, Dr. O'Leary concluded that releasing the children into Mother's care would be dangerous, that Mother "is incapable of being a consistent or safe parent without consistent monitoring and control," that she was "not capable of providing a consistently stable environment for her children now or in the foreseeable future," and that "he could not conceive of any treatment that would remedy Mother's deficits within a reasonable time frame."

Thereafter, on June 22, 2009, DCS filed a petition to terminate Mother's parental rights to her children. A trial was held on November 13, 2009.

During the trial, the depositions of Paige Cummings[2] and Dr. O'Leary were proffered by DCS as evidence. Mother moved to suppress the depositions upon the ground the witnesses had not signed their depositions. The deposition transcript represented that, by stipulation, the parties and the witnesses agreed to waive signatures of the witnesses. Mother, however, asserted that the parties did not stipulate to any waiver of signatures and the depositions should be suppressed because neither witness signed the deposition. After hearing arguments from both parties, the trial court ruled that the depositions would be admitted into evidence if the witnesses signed the depositions. DCS obtained the signature of Ms. Cummings and Dr. O'Leary on their respective deposition transcripts and filed them with the court. Thereafter, the court ruled on the merits of the case, finding that DCS made reasonable efforts to assist Mother and to address Mother's specific needs, that Mother abandoned David and Savannah by failing to provide a suitable home, that she failed to remedy persistent conditions that prevented her children's return to her care, and that she was mentally incompetent to care for the children. The trial court also found that termination was in the children's best interests for numerous reasons, including the fact the children had formed a bond with their foster parents who were willing to adopt the children. Based on the

_____

[2]Paige Cummings, the family services worker assigned to assist Mother in Washington, testified that she had serious concerns about Mother's ability to parent her children due to Mother's history, her behavior and poor choices, and Mother's failure to complete the court-ordered programs that were to help Mother remedy her fundamental deficiencies.

above findings, the trial court entered judgment terminating Mother's parental rights to David and Savannah. This appeal followed.

## ANALYSIS

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

ISSUES

Mother raises three main issues on appeal. First, she contends the trial court abused its discretion by admitting into evidence and considering the depositions of Dr. O'Leary and Paige Cummings. Second, she contends DCS did not make reasonable efforts to reunify her

with her children. Third, she contends that trial court erred by finding clear and convincing evidence of grounds for termination of her parental rights. We will discuss each issue in turn.

ADMISSION OF DEPOSITIONS

Mother argues that the depositions of Paige Cummings and Dr. O'Leary should not have been admitted into evidence because she did not waive the requirement that the witness read and sign the deposition. Mother also asserts it was error to admit the depositions into evidence after they were signed by the witnesses because the procedure by which DCS obtained the signatures of the witnesses was not in compliance with Tenn. R. Civ. P. 30.05. We have determined the trial court did not abuse its discretion by admitting the depositions into evidence once the witnesses signed the depositions.

A trial court's ruling on the admissibility of evidence is within the sound discretion of the trial court and issues regarding the admission of evidence are reviewed by this court under the abuse of discretion standard. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001).

An abuse of discretion occurs when a court either goes beyond the framework of the applicable legal standards or when a court fails to properly consider the factors customarily used to make that discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (citations omitted). A discretionary decision, [such as the admission of evidence], will be set aside only when the deciding court applied incorrect legal standards, reached an illogical conclusion, decided the case on a clearly erroneous assessment of the evidence, or employed reasoning that will cause injustice to the complaining party. *Konvalinka v. Chattanooga-Hamilton County Hospital Authority*, 249 S.W.3d 346, 358 (Tenn. 2008) (citations omitted).

The depositions of Paige Cummings and Dr. O'Leary were conducted over the phone. Tenn. R. Civ. P. 30.05, which governs the signing of depositions, provides that once the deposition is completed and transcribed "[t]he deposition shall then be signed by the witness, unless the parties by stipulation waive the signing." When the depositions were first filed with the trial court the depositions did not bear the signature of the witness; however, each deposition contained a representation by the court reporter that the parties and witness agreed that: "[a]ll formalities as to notice, caption, certificate, reading and signing of the deposition are waived."

Mother filed a motion to suppress the deposition, asserting that she did not waive the requirement that the witness read and sign the transcript. *See* Tenn. Rule Civ. P. 32.04 (which provides that any "errors and irregularities in the manner in which . . . the deposition is

-6-

prepared, signed, [or] certified" are automatically waived "unless a motion to suppress the deposition . . . is made with reasonable promptness.").

In support of her argument, Mother points to this court's decision in *State*, *DHS for Martin v. Neilson*, 771 S.W.2d 128, 131 (Tenn. Ct. App. 1989) wherein we determined the failure of the witness to sign the deposition was fatal to its admission. We, however, find *Neilson* distinguishable. The *Nielson* deposition expressly stated that the witness's signature was not waived. The facts in *Nielson* are in sharp contrast to the facts presented here. In the present case, each transcript contains an affirmative representation by the court reporter that the parties and witnesses agreed: "[a]ll formalities as to notice, caption, certificate, reading and signing of the deposition are waived."

Had the trial court found that Mother agreed to waive all formalities except as to the form of the questions, as the court reporter stated, then Mother would have waived the requirement and the depositions would have been admissible without the witnesses' signatures. However, the trial court did not determine whether Mother agreed to the waiver. Instead, the trial court rendered the issue moot by holding that the depositions would be admissible if the witnesses signed the depositions. After the hearing, counsel for DCS submitted the depositions to the witnesses, each witness signed the transcript of his or her deposition, and the signed depositions were filed with the court.

Notwithstanding the foregoing, Mother contends the depositions are still inadmissible because the transcripts were not submitted to the witnesses by the court reporter. Instead, counsel for DCS erroneously submitted them to the witnesses.

Tenn. Rule Civ. P. 30.05 states that "[w]hen the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness . . . ." Rule 30.05 further states that "[a]ny changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer. . . ."

The rules do not expressly prohibit counsel from submitting a deposition to a witness for reading and signature, however, it is apparent from reading the various provisions of the rules that the court reporter has the duty to "submit" the transcript of the deposition to the witness unless the signature of the witness is waived.[3] We also find it significant that, once

_____

[3] Tenn. R. Civ. P. 30.05 provides:

When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless such examination and reading are

(continued...)

Rule 30.05 is satisfied, the court reporter has the affirmative duty to deliver the deposition and exhibits to "the party who requested taking of the deposition." Tenn. Rule Civ. P. 30.06.

It is obvious from the record that the court reporter verily believed the signatures of the witnesses had been waived, and once she completed the transcript she satisfied her duties under Rule 30.05. Believing she satisfied the requirements of Rule 30.05, the court reporter delivered the unsigned depositions, along with the exhibits, to counsel for DCS as mandated by Rule 30.06. Having done so, the court reporter's Rule 30 duties were fulfilled.

The trial court held that it would admit the depositions into evidence if the signatures of the witnesses were obtained, and the record indicates that the trial court was aware counsel for DCS would be submitting the depositions to the witnesses for signature. Counsel for DCS submitted the deposition transcripts, and the witnesses signed the depositions. The transcripts were then filed with the court, as the trial court authorized.

The trial court made a discretionary decision allowing counsel for DCS to obtain the requisite signatures. The witnesses signed the depositions, and the signed depositions were filed with the trial court before the court ruled on the case. We find no abuse of discretion with this decision. Therefore, we affirm the decision of the trial court in admitting the two depositions into evidence.

THE DEPARTMENT'S RESPONSIBILITIES

DCS is the agency responsible for the care and protection of dependent and neglected children. Because of the importance of the family unit, DCS has the "responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B*., 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166 (2007)). Reasonable efforts are defined as the "exercise of

---

[3](...continued)
waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer [court reporter] with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days of its submission, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32.04(4) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2010).[4]

Although the DCS is generally required to prove that it has made reasonable efforts at reunification, "[t]here are cases in which a parent is proven to be so mentally incapacitated that efforts by the Department to address the parent's mental health issues would be in vain." *In re Keisheal N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *8 (Tenn. Ct. App. Apr. 16, 2010). If the parent's mental condition is presently so impaired *and* the parent's mental condition is likely to remain so that it is unlikely that the parent will be able to resume care of the child in the near future, then the DCS is excused from exerting reasonable efforts to reunify the parent and child. *Id*. at *7 (citing Tenn Code Ann. § 36-1-113(g)(8)(B) (2010) (emphasis added)). Accordingly, before evaluating the scope and extent of DCS's efforts at reunification, we will examine whether such efforts would be in vain.

## MENTAL INCOMPETENCE

A parent's rights may be terminated on the ground of mental incompetency if the court determines, by clear and convincing evidence[5] that the parent cannot adequately provide care and supervision to the child because the parent's mental condition is impaired and is likely to remain so that it is unlikely that the parent will be able to a care for the child in the near future, and that termination of parental rights is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B) (2010). Thus, the burden is on DCS to demonstrate two

---

[4]The factors used to determine the reasonableness of efforts include:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental capabilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B*., 228 S.W.3d at 158-59 (citing *In re Giogianna H*., 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) (footnote omitted)).

[5]The clear and convincing evidence standard is a heightened burden of proof, which serves to minimize the risk of erroneous decisions. *In re C.W.W*., 37 S.W.3d at 474; *Matter of M.W.A., Jr*., 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W*., 37 S.W.3d at 474. Clear and convincing evidence should produce a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estates of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *Witcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

essential facts: (1) that Mother is *presently unable* to care for the subject children and (2) that Mother is *unlikely to be able to care for the children in the near future*. Tenn. Code Ann. § 36-1-113(g)(8) (2010) (emphasis added). We have determined that DCS satisfied its burden of proof as to both essential facts.

There is clear and convincing evidence to establish that Mother is presently unable to care for her children due to her mental incompetence. Mother has given birth to seven children, and all seven children have been removed from Mother's care and placed in state custody. She consistently cohabits with men who are physically abusive and several of them are chronic drug users, as well as convicted sexual offenders. Mother has been hospitalized for suicidal and homicidal thoughts, and she has been diagnosed with various mental illnesses and personality disorders. Morever, the record reveals that Mother is unwilling to address her mental health issues. The above facts are sufficient to establish by clear and convincing evidence that it would be dangerous to place the children in the care of or under the supervision of Mother.

There is also clear and convincing evidence to establish that it is unlikely Mother will be able to assume or resume the care of and responsibility for the children in the near future. This is readily apparent from Mother's recurring history and the convincing testimony of Dr. O'Leary. As noted above, Mother has a substantial and persistent history of cohabiting with physically abusive men who use drugs and are sex offenders. Moreover, the record indicates that Mother does not intend to break the chain of self destructive conduct, and she does not appreciate the fact that her conduct poses a great threat of harm to the children.

Mother has been diagnosed with a number of mental health problems. Therefore, her period of recovery could be prolonged, rendering it most unlikely that she would be able to care for her children in the near future. Mother has been hospitalized for suicidal and homicidal thoughts, and has been diagnosed with bipolar disorder, schizophrenia, Post Traumatic Stress Disorder, major depression, as well as mixed personality disorder with narcissistic, histrionic, and borderline features. Dr. O'Leary testified that "[Mother's] treatment needs are extensive and are likely to require two to three years of intensive psychiatric intervention . . . ." Furthermore, Dr. O'Leary testified that he did not believe Mother would benefit from treatment because in the thirteen years since first being hospitalized, she has continued to engage in the same negative behaviors and expose her children to substantial risks.

In addition to the substantial period of time needed for treatment and the fact that Mother has engaged in the same behavior for years, Mother appears most unwilling to address her numerous mental health issues, and, as a result, it is unlikely that she will be able to care for her children in the near future. Dr. O'Leary testified the treatment options

available to Mother would only work if "she were motivated and able to recognize her deficits, which she's not." During Dr. O'Leary's psychological evaluation, Mother stated that she did not feel she had any psychiatric problems, despite her earlier diagnosis of bipolar disorder and schizophrenia. Testimony by Ms. Cummings further supports Dr. O'Leary's opinion that Mother is not motivated to address her mental issues. Ms. Cummings testified that Mother failed to perform many of the requirements deemed most important for recovery by the Washington court. According to Ms. Cummings, Mother missed numerous domestic violence classes, as well as meetings to set up individual counseling. The testimony of Dr. O'Leary and Ms. Cummings establishes clearly and convincingly that Mother is unwilling to address her mental issues. Even if she were willing, the necessary psychiatric treatment would take at least two years to complete, a time frame that is certainly not in the near future. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B) (2010).

Based on Mother's history and the testimony of Dr. O'Leary and Ms. Cummings, we find that the Department has proved by clear and convincing evidence that Mother is presently unable to care for her children, and it is highly unlikely that she will be able to care for them in the near future. Therefore, we conclude that the Department has proven the ground of mental incompetence under Tenn. Code Ann. § 36-1-113(g)(8)(B) (2010).

WOULD FURTHER EFFORTS AT REUNIFICATION BE IN VAIN?

As noted earlier, we must now determine whether DCS was excused from its responsibility to exert reasonable efforts to reunify Mother with her two children and, if not, whether it exerted reasonable efforts toward reunification.

For the reasons discussed in detail in the analysis above, we find the record provides clear and convincing evidence that further departmental efforts toward reunification would have been in vain. The record convincingly establishes that Mother was unwilling to acknowledge her mental health needs, that she had failed to benefit from previous mental health services, that even if extensive mental health services and treatment were provided the prospect of success was modest and the period of time needed to determine if success was possible would be measured in years, a time too distant, especially considering the poor prospect of success, to justify the delay.

GROUNDS FOR TERMINATION

The trial court found three grounds upon which Mother's rights could be terminated if termination of her parental rights was in the best interests of the children. Tenn. Code Ann. § 36-1-113(c) (2010) provides that one ground is sufficient. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). We

have affirmed the finding of the ground of mental incompetence. Accordingly, we need not examine the other grounds, only whether termination is in the children's best interests. *Id*.

BEST INTERESTS OF THE CHILDREN

In determining whether termination of parental rights is in the best interests of a child, the court is to consider certain statutory factors, including the following:

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;
>
> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> . . . .
> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent . . . consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or
> . . . . .

Tenn. Code Ann. § 36-1-113(i) (2010).

Considering the relevant statutory factors regarding the best interests of the children, a reasonable person could come to only one conclusion, that it is no longer in the best interests of the children to continue this parent-child relationship.

The psychological evaluation conducted by Dr. O'Leary revealed that Mother allowed her children to be in the presence of violence because she "loved them [the men]." As is obvious to even a layperson, Dr. O'Leary testified that Mother's statement was illogical and it demonstrated Mother's inability to protect her children. Further, it is clear that Mother places a higher value on her own needs than those of her children. This is evident from her statement that she stays in relationships with abusive men because she is fearful her children will be taken away by child protective services if she reports the abuse. There is also evidence that Mother continues to be abusive towards her children. Ms. Cummings testified that Mother became "violent" toward one of her children during a visitation, and that Mother had to be physically removed from the room because she continued to escalate the situation and physically handle her child.[6]

Dr. O'Leary testified that Mother is incapable of learning from her experiences because she "selects men who are dysfunctional, addicted, abusive, or have a criminal history." Furthermore, Dr. O'Leary testified that when monitoring by state agencies is withdrawn, "[Mother] tends to go back into her previous pattern of narcissistic parenting, which is focused on meeting her needs but not the needs of her children."

The children have been living with a foster family since their removal from Mother and the foster parents wish to adopt the children should they become eligible for adoption. The children have formed a bond with their foster parents. A change in caretakers and physical environment will certainly have a negative effect of the children's emotional and psychological condition. *See* Tenn. Code Ann. § 36-1-113(i)(5) (2010). The children need an opportunity to grow in a caring environment, and being adopted by foster parents will afford them that opportunity.

For the reasons stated above, and other compelling facts appearing throughout this opinion including Mother's various mental health issues, her persistent association with sexual offenders and physically abusive men, her inability to protect her children, and the fact the children are in a stable and loving environment with foster parents who desire to adopt them, and realizing that a change of caretakers and physical environment is very likely to have a significant adverse effect on the children's emotional and medical condition, we find

---

[6] This episode occurred in Washington and did not involve the subject children, nevertheless, it is strong evidence of her inability to properly parent the children.

the record clearly and convincingly proves that termination of Mother's parental rights is in the best interests of the children at issue here.

We, therefore, affirm the trial court's finding that termination of Mother's parental rights is in the best interests of both children.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to Mother's indigency.

_____
FRANK G. CLEMENT, JR., JUDGE